UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

JAMAL COLEMAN and SHEENA
COLEMAN,

        Movants,

v.

LENNAR CORPORATION,

        Respondent.

Case No. 18-mc-20182-KMW/TORRES

---

JAMAL COLEMAN, and
SHEENA COLEMAN,

        Plaintiffs,

v.

WEYERHAEUSER COMPANY,

        Defendant.

Case No. 1:17-cv-01093-VAC-SRF
U.S.D.C. District of Delaware

---

## **MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION**

Movants Jamal Coleman and Sheena Coleman ("Plaintiffs" in the underlying case in which the Subpoena was issued), move to compel Respondent Lennar Corporation's ("Lennar") compliance with a Subpoena served on November 29, 2017. The information sought is relevant to Plaintiffs' putative class action in the District of Delaware against Defendant Weyerhauser Company ("Weyerhauser") for producing and selling defective and poisonous floor joists. The information sought is also available only from Lennar, one of the homebuilders who installed the joists in newly-constructed homes nationwide. Plaintiffs seek information about the impact of the defective joists, communications about the defective joists, and data about the marketability

1

of Lennar's homes containing the defective joists.

In response to the Subpoena, Lennar has asserted boilerplate burden and privilege objections unsupported by any factual assertions. To date, Lennar has failed to produce any documents, even though production was due on December 27, 2017. In an effort to resolve Lennar's objections without court intervention, Plaintiffs have voluntarily narrowed their requests to seek only relevant, non-burdensome and discoverable material. As such, Lennar's objections should be overruled and Plaintiffs' motion should be granted.

## BACKGROUND

In the underlying District of Delaware action, Plaintiffs brought a national class action against Weyerhaeuser for producing and selling defective and poisonous TJI® Joists[1] with Flak Jacket Protection (the "Joists"). *See* Declaration of Lawrence Deutsch ("Deutsch Decl.", Ex. 1 – the Complaint.) The Joists are coated with Weyerhaeuser's 4th Generation "Flak Jacket," which Weyerhaeuser marketed as a proprietary, factory-applied coating that enhances the Joists' fire resistance. However, the Flak Jacket is defective because it emits toxic formaldehyde fumes. The Joists off-gas so much formaldehyde that they render entire homes uninhabitable. Weyerhaeuser has relocated homeowners out of their homes as a result of the presence of the Joists, requires workers to use respiratory protection when working in basements containing the Joists, and has advised workers to not enter the areas of homes containing the Joists for more than 10 minutes at a time without protection.[2]

---

[1] "TJI® joists are a key part of making a high-performance floor." *See* https://www.weyerhaeuser.com/woodproducts/engineered-lumber/tji-joists/ (last accessed Feb. 19, 2018).

[2] *See* Weyerhaeuser's Updated Guidance Regarding Access to the Basements of Affected Homes (July 25, 2017), available at

Formaldehyde is dangerous.  Short-term human exposure to formaldehyde has been shown to cause respiratory irritation, burning eyes, nose, and throat; headaches; coughing; dizziness; nausea; and joint pain.  It has also been linked to exacerbation of asthma in formaldehyde-sensitive individuals.  It poses a particularly acute risk to children.  Long-term exposure to formaldehyde is linked to increased risk of cancer of the nose and sinuses, nasopharyngeal and oropharyngeal cancer, lung cancer, and leukemia.[3]  (Deutsch Decl. Ex. 1, ¶5.)

In the *Coleman* complaint, Plaintiffs assert causes of action against Weyerhaeuser for breach of express warranty, breach of implied warranty, violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq*.), negligence, failure to warn, violation of the Delaware Consumer Fraud Act (Del. Code Ann. tit. 6, § 2511, *et seq*.), unjust enrichment, and the Declaratory Judgment Act (28 U.S.C. § 2201, *et seq*.).  (Deutsch Decl., Ex. 1, ¶¶58-146.) Weyerhaeuser claims that when it became aware of the dangerous problems with the Joists, it halted all production, sales and shipments of the product.[4]  (*See also* Joint Rule 26(f) Report, *Coleman* ECF No. 9 at 3.)

Thousands of homes around the country have been affected by the Joists' defect. Plaintiffs have identified at least thirty-five (35) builders, including Lennar, who were involved in the construction of those homes.  (Deutsch Decl. ¶ 2.)  One of the key factual disputes is whether Weyerhaeuser recklessly or intentionally allowed the Joists to be sold and integrated

---

https://www.weyerhaeuser.com/application/files/5215/1303/5785/Guidance_Regarding_Access_to_Basements_-_Updated_7_25_17.pdf (last accessed Feb. 1, 2018).
[3] *See* Formaldehyde and Cancer Risk, National Cancer Institute, available at https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet (last accessed Feb. 1, 2018).
[4] *See* Weyerhaeuser press release, July 18, 2017, available at http://investor.weyerhaeuser.com/2017-07-18-Weyerhaeuser-issues-statement-regarding-TJI-R-Joists-with-Flak-Jacket-R-Protection (last accessed Feb. 1, 2018).

into Plaintiffs' and class members' homes in spite of the fact that it knew, or should have known, that the Joists were defective and dangerous to human health. (Deutsch Decl. Ex. 1, ¶¶3-4.) Accordingly, information about the timing and nature of Weyerhaeuser's efforts to warn builders and homeowners is relevant to Plaintiffs' claims regarding failure to warn.

From a damages perspective, Plaintiffs allege that the presence of the defective Joists in their homes has negatively impacted their ability to sell their homes. Weyerhaeuser's remediation of the defects in the Joists involves one of three approaches: (1) the application of a proprietary paint intended to curb future emissions, which is a novel and is as-yet-unproven as a long-term solution; (2) scraping off the Flak Jacket material and then applying the proprietary paint; or (3) total removal of the Joists, which potentially imperils the structural integrity of the homes. All of these methods can impact the homes' resale value. And, regardless of whether the remediation is effective from a formaldehyde abatement standpoint, Plaintiffs are required to disclose the defect when they ultimately sell homes that contain (or contained) the Joists. This disclosure is likely to affect consumers' perception of the homes and to have a negative impact on the homes' resale value. (*See* Declaration of Ronald Throupe ("Throupe Decl.") ¶ 4.)

Lennar is one of the builders who installed the Joists in newly-constructed homes. At the time Weyerhaeuser announced the problem with the Joists, some of the Lennar homes containing the Joists may have been already sold and occupied. Other homes were presumably subject to purchase and sale agreements but had not yet closed, or were as-yet unsold.

As the builder and seller of a number of affected homes, Lennar is in unique possession of relevant and discoverable information about the impact of the Joists, including communications with current homeowners, potential homebuyers, and others about the Joists. Lennar is also in unique possession of identifying information on class members, as well as data

about the marketability of homes containing the Joists, including information related to both the pricing of the homes and how long the homes are taking to sell.

On November 29, 2017, Plaintiffs served a Subpoena on Lennar.  (Deutsch Decl. Ex. 2.)  On December 13, 2017, Lennar served a letter and formal objections to the Subpoena.  (*Id.* Ex. 3.)  In its letter, Lennar made clear that it "will condition its production of documents, if any, on complete resolution of its objections."  (*Id.*)

Plaintiffs then engaged in numerous communications with counsel for Lennar, in efforts to address Lennar's objections and amicably resolve the disputes over the Subpoena.  (Deutsch Decl. ¶¶4-8.)  The first teleconference was held on December 19, 2017.  (*Id.*)  Following that call, and in an effort to address Lennar's objections over burden and confidentiality, Plaintiffs' counsel emailed Lennar's counsel to provide the operative confidentiality order on December 19, 2017 and proposed search terms on December 24, 2017.  (*Id.*, Ex. 4.)  Lennar rejected these proposals on January 3, 2018.  (*Id.*, Ex. 5.)

In response, Plaintiffs provided a new proposal on January 10, 2018, with further limited search terms and production categories.  (*Id.*)  This proposal was discussed with Lennar's counsel on January 23 and February 9, 2018, but Lennar ultimately rejected this proposal as well.  (*Id.*)  This final rejected proposal would have involved Lennar producing:

1. All documents that related to diminution in value of homes due to the defective joists.
2. Purchase and sale agreements for all homes in the affected homes' developments, along with doc[uments] sufficient to determine which homes have similar layout/features and which homes had/did not have [the] joints.
3. Documents sufficient to show how long homes (with the bad joints versus without the bad joists) remained on [the] market.
4. All disclosures to buyers/realtors re: the problematic joists/formaldehyde/remediation.
5. Documents sufficient to who what kind of remediation was performed [on the affected homes].

5

6. Any internal documents or analysis showing the effectiveness of the remediation.
7. If Lennar contracted with its own companies/engineers independent of Weyerhauser [with respect to remediation] communications with those entities.
8. Formaldehyde testing results [for affected homes] (pre and post remediation).

(*Id.*)  Lennar rejected this proposal, and has produced no documents responsive to the Subpoena. On February 19, 2018, Lennar's counsel and Plaintiffs' counsel exchanged emails memorializing the stalemate on resolving Lennar production under the subpoena.  (Deutsch Decl. ¶8.)  Plaintiffs now bring this motion to compel production.

## STANDARD

> Rule 45 governs discovery of non-parties by subpoena. Fed.R.Civ.P. 45. If an objection is made, the party serving the subpoena is not entitled to the documents at issue but may, upon notice to the person commanded to produce, seek an order to compel the production. Fed.R.Civ.P. 45(c)(2)(B). The scope of discovery through a subpoena is the same as that applicable to Rule 34 and other discovery rules. Fed.R.Civ.P. 45 advisory committee's note to the 1970 Amendments. While Rule 45 does not include relevance as an enumerated reason for quashing a subpoena, it is well settled that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b) and Rule 34. As such, a court must examine whether a request contained in a subpoena duces tecum is overly broad or seeks irrelevant information under the same standards set forth in Rule 26(b) and as applied to Rule 34 requests for production. *See* Fed.R.Civ.P. 45(d)(1) advisory committee's note to the 1970 Amendment ("[t]he changes make it clear that the scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules."); *see also* 9A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2459 (2d ed.1995) (scope of discovery through a subpoena is "exceedingly broad" and incorporates the provisions of Rule 26(b) and Rule 34).

*Kona Spring Water Distrib., Ltd. v. World Triathlon Corp.*, No. 8:05-CV-119-T-23TBM, 2006 WL 905517, at *2 (M.D. Fla. Apr. 7, 2006).

**ARGUMENT**

**I. Plaintiffs' Requests are Reasonable and Seek Discoverable Information.**

Plaintiffs have voluntarily narrowed the Subpoena to seek only information relevant to the claims at issue in the case, without imposing an undue or oppressive burden on Lennar. The requests at issue in this motion are on point. Indeed, despite the fact that Lennar has produced no documents responsive to the Subpoena, Plaintiffs only seek to compel documents responsive to the categories listed in Plaintiffs' most recent proposal to Lennar's counsel, listed above. Each of the categories at issue seeks relevant, non-burdensome discovery from Lennar, as detailed below.

      A.      <u>Category Nos. 1 and 3 Seek Relevant Information.</u>

In Category No. 1, Plaintiffs seek: "all documents that related to diminution in value of homes due to the defective joists," and in Category No. 3, Plaintiffs seek "documents sufficient to show how long homes (with the bad joists versus without the bad joists) remained on [the] market." (Deutsch Decl., Ex. 5.) These categories seek a narrowed subset of the documents originally sought in Request No. 17 of the Subpoena. (*Id.*, Ex. 2.)

The documents in these categories would not be expected to be privileged or otherwise confidential (and Lennar could designate them as Confidential pursuant to the applicable protective order if it so chose). Nor would they be burdensome to produce; the response to Category No. 3 (length of time on the market) is likely to consist of a single pre-existing spreadsheet; and documents responsive to Category No. 1 (documents relevant to diminution in value) will consist largely of easily identifiable purchase and sale agreements, plus additional documents which can be identified though an email search and conversations with relevant custodians regarding responsive memos, analyses or other documents. As a major national

builder, one would expect that Lennar would analyze the impact on its pricing of its home sales, particularly since it has a duty to report its financial condition as a publicly-traded company.[5] Furthermore, these documents are not available from Weyerhaeuser. These documents are needed for Plaintiffs' expert to analyze the putative class members' damages related to diminution in value and/or decreased marketability of their affected homes. In order for Plaintiffs' expert to effectively analyze how the presence of the Joists may have affected home values (or time on the market), Plaintiffs' expert needs information about home prices and time on the market. (Throupe Decl. ¶¶ 4, 5.)

      B.    <u>Category No. 2 Seeks Relevant Information.</u>

In Category No. 2, Plaintiffs seek

> Purchase and sale agreements for all homes in the affected homes' developments, along with doc[uments] sufficient to determine which homes have similar layout/features and which homes had/did not have [the] joists

(Deutsch Decl., Ex. 5.) This category seeks a subset of the documents originally sought in Request No. 16 of the Subpoena. (*Id*., Ex. 2.)

The contracts at issue are not privileged or reasonably confidential (and Lennar could designate them as Confidential pursuant to the applicable protective order if it so chose). Nor can Lennar reasonably assert that producing the contracts would be unduly burdensome. Furthermore, these documents are not available from Weyerhaeuser. In terms of relevance, the full contracts are needed to (1) identify putative class members, (2) provide to Plaintiffs' experts for analysis of the putative class members' damages related to diminution in value and/or decreased marketability of the affected homes, and (3) evaluate Weyerhaeuser's argument that

---

[5] In Lennar's most recent SEC filing, Lennar reported $9.7 billion in revenues related to homebuilding in 2016. See http://investors.lennar.com/~/media/Files/L/Lennar-IR/documents/annual-reports/annual-report-2016.pdf, last accessed Feb. 16, 2018.

8

some class members may be compelled to arbitrate their claims. In order for Plaintiffs to effectively analyze how the presence of the Joists may have affected home values, Plaintiffs need information about home prices and also about any other concessions that may have been made at closing to make the impacted homes more attractive to potential purchasers. (Throupe Decl. ¶¶ 4, 5.) Plaintiffs also need to see all of the contracts, as signed, to address Weyerhaeuser's argument that some class members are bound by arbitration agreements. The specific wording of arbitration clauses can be key to their enforceability, and class members may have modified that wording, even by hand at a closing. Like in the parallel *Walewski* litigation, Plaintiffs should be allowed to examine the final agreements. *See Walewski v. Weyerhaeuser NR Company*, No. 1:17-cv-01940, ECF No. 38 at 8 (D. Colo.) (recognizing the relevance of these agreements and ordering the plaintiff to produce their signed purchase and sale agreement).

      C.      Category No. 4 Seeks Relevant Information.

In Category No. 4, Plaintiffs seek "[a]ll disclosures to buyers/realtors re: the problematic joists/formaldehyde/remediation." (Deutsch Decl., Ex. 5.) This category seeks a subset of the documents originally sought in Request No. 6 of the Subpoena. (*Id.*, Ex. 2.)

Communications by Lennar about the defective product at issue – including communications with putative class members and prospective purchasers about the Joists and remediation – are plainly relevant. These communications will demonstrate not only how the Joists manifested the defect, but also how and to what extent the presence of the Joists affected the marketability of the affected homes. To the extent Lennar disclosed the defect to prospective purchasers, a link can potentially be drawn between resale value (or time spent languishing on the market) and the presence of the Joists. If the defect was not disclosed, then that fact would also be relevant as it would impact whether the sales data for these homes reflects the impact of

9

the Joists. Lastly, Lennar also possesses relevant anecdotal evidence regarding inquiries from prospective homebuyers. None of this evidence is available from Weyerhaeuser.

      D.    <u>Category Nos. 5 through 8 Seek Relevant Information.</u>

In Category Nos. 5-8, Plaintiffs seek information regarding the remediation of the affected homes. Specifically:

- Category 5 seeks "Documents sufficient to show what kind of remediation was performed [on the affected homes];"
- Category 6 seeks "[a]ny internal documents or analysis showing the effectiveness of the remediation;"
- Category 7 seeks communications, "if Lennar contracted with its own companies/engineers independent of Weyerhauser [with respect to remediation], communications with those entities;
- Category 8 seeks "[f]ormaldehyde testing results [for affected homes] (pre and post remediation)."

(Deutsch Decl., Ex. 5.) These categories seek a subset of the documents originally sought in Request Nos. 3 and 4 of the Subpoena. (*Id.*, Ex. 2.)

These narrowed requests, which all relate to the remediation process, seek documents from a very limited period of time (approximately the last 8 months), in which Weyerhaeuser's remediation plans were put into effect on class members' homes, including homes constructed by Lennar. Because of the limited time period involved, and the likelihood that only a few employees of Lennar were involved in the process, the request is unlikely to improperly burden Lennar. Further, none of this information is available from Weyerhaeuser.

As discussed above, the remediation was not uniform, and at least three different remediation methods were used on affected homes. The effectiveness of all of these remediation methods is at issue in the case, addressing the merits, damages and class certification. Whether these remediation methods worked has a huge impact on the putative class members, including potential implications for their heath and the future values of their homes. Furthermore, whether

all of the methods have the same level of effectiveness (or if different methods have different levels of effectiveness) is relevant to class certification, as it goes to the question of whether all putative class members are similarly situated.

## II.  Lennar's General Boilerplate Objections Lack Merit and Have Been Waived.

Lennar's objections contain a potpourri of arguments opposing Plaintiffs' Subpoena, none of which have merit.  Below, Plaintiffs respond to the objections, and explain why Lennar should be required to comply with the Subpoena.

### A. The Subpoena Complies with the Scheduling Order.

In its objections, Lennar misconstrues the *Coleman* scheduling order and alludes to the Subpoena seeking information which does not pertain to class certification.  The Subpoena is consistent in all respects with the schedule set by the Delaware court. (Deutsch Decl. Ex. 7.) First, the Subpoena seeks information which is relevant to class certification.  Information regarding the effectiveness of remediation is relevant to class certification, because Plaintiffs may need to be able to demonstrate that the remediation was similarly effective for all putative class members.  Additionally, because Plaintiffs seek actual damages, information about the impact of the presence of the Joists on the homes' resale values is also relevant to Plaintiffs' bid for class certification.  Plaintiffs may seek to show that diminution in value can be demonstrated through common evidence and/or methodology.  Empirical evidence regarding the sale/resale value of homes impacted by the Joists is undoubtedly relevant to this analysis. (Throupe Decl. ¶ 4.)

Second, the *Coleman* scheduling order does not mandate any bifurcation between class certification and merits discovery. (*See* Deutsch Decl., Ex. 7.)  Instead the scheduling order merely memorializes that *Plaintiffs and Defendant* have agreed to *prioritize* class certification-

related discovery for purposes of production.  (*Id*. at ¶3.)  There is no cohesive method to prioritize third-party discovery, as doing so would require Plaintiffs to either issue subpoenas seriatim, depending on what level of priority documents Weyerhaeuser has most recently produced, or to negotiate separate priorities with each builder.  As to third parties, discovery is open and should proceed, *in toto*.  Lennar cites no law and makes no coherent argument to the contrary.

> B.    <u>Lennar Has Failed to Establish That Compliance Would Be Burdensome</u>.

When a party objects to a subpoena on the basis of burden, the burden of proving that a subpoena is oppressive is a heavy one.  *See Amerisure Ins. Co. v. All County Drywall Serv., Inc.*, 12-CV-24454-UNGARO/TORRES, 2013 WL 12094848, at *2 (S.D. Fla. Oct. 24, 2013) ("This district has made clear that the 'party resisting discovery has a heavy burden of showing why the requested discovery should not be permitted.'") (citations omitted); *see also Forrest Crompton v. 5–hour Energy*, 4:16-MC-00348 JAR, 2016 WL 4061881, at *3 (E.D. Mo. July 29, 2016).

Generally speaking, a party objecting on these grounds must present actual evidence of the burden, usually in the form of an affidavit.  *See Amerisure*, 2013 WL 12094848 at *2 ("[T]he party's '**objection** must show specifically how a discovery request is overly broad, burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden.'") (citation omitted and emphasis in original); *see also* 9 James Wm. Moore et al., Moore's Federal Practice ¶ 45.51[4] (3d ed. 2009) ("A party objecting to a subpoena on the ground of undue burden generally must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.").  For example, in *Amerisure*, this Court rejected Lennar's undue burden objection because "[t]he only evidence that Lennar provide[d] as to why th[e] request [was] overly burdensome [was] the fact that these [requested

homeowners] files [were] kept in multiple locations in Florida and would require Lennar personnel to compile the documents for inspection and/or copying." 2013 WL 12094848 at *2.

Here, Lennar's burden objections are entirely boilerplate and conclusory. They are not supported by any evidence whatsoever. Like in *Amerisure*, Lennar has failed to "show specifically how [Plaintiffs'] discovery request" are "burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden." *Id.* Nor has Lennar even attempted to estimate the burden of compliance, in terms of hours, dollars, or any other metric. These failures alone are sufficient to disregard Lennar's objections. *See id.*; *see also Forrest Crompton*, 2016 WL 4061881, at *3 (denying motion to quash where movant had not "specified the time or resources necessary to comply or explained how compliance would actually be burdensome").

Furthermore, it is too late for Lennar to fix these errors. Time and again, courts have made clear that merely reciting boilerplate objections to discovery requests results in waiver of those objections. *See, e.g.*, *Fischer v. Forrest*, No. 14CIV1304PAEAJP, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017); *Johnson v. Neiman*, No. 4:09CV0689 JCH, 2010 WL 3081472, at *1 (E.D. Mo. Aug. 5, 2010) (striking "unsubstantiated, boilerplate objections"); *Liguria Foods, Inc. v. Griffith Labs., Inc.*, 320 F.R.D. 168, 187 (N.D. Iowa 2017) ("[T]he idea that such general or 'boilerplate' objections preserve any objections is an 'urban legend.'"); *Sobol v. Imprimis Pharm.*, No. CV 16-14339, 2017 WL 5035837, at *4 (E.D. Mich. Oct. 26, 2017) ("boilerplate objections are legally meaningless and amount to a waiver of an objection"); *Strategic Mktg. & Research Team, Inc. v. Auto Data Sols., Inc.*, No. 2:15-CV-12695, 2017 WL 1196361, at *2 (E.D. Mich. Mar. 31, 2017) ("Boilerplate or generalized objections are tantamount to no objection at all and will not be considered by the Court."); *Mancia v. Mayflower Textile Servs.*

13

*Co.*, 253 F.R.D. 354, 358 (D. Md. 2008) ("[B]oilerplate objections that a request for discovery is 'over[broad] and unduly burdensome, and not reasonably calculated to lead to the discovery of material admissible in evidence,' persist despite a litany of decisions from courts, including this one, that such objections are improper unless based on particularized facts.").

Despite the complete lack of any factual basis on which to assess Lennar's burden, Plaintiffs unilaterally attempted to reduce any burden in several ways, all to no avail. First, Plaintiffs offered to assist Lennar with searching for electronically-stored information through the use of search terms. Lennar rejected this offer and made no counter-proposal. (Deutsch Decl. ¶ 4.) Second, Plaintiffs unilaterally withdrew requests for information about Lennar's communications with Weyerhaeuser. (*Id.* ¶5.) Plaintiffs' remaining requests now largely consist of information related to purchase and sale data and documentation, as well as information and communications regarding remediation, all of which should presumably be easily retrievable with reasonable effort. (*Id.* ¶ 5-8.)

   C. <u>The Subpoena Does Not Seek Privileged Materials</u>.

Lennar's objections with respect to privilege also miss the mark. Lennar's objections contain boilerplate stating that it objects to Plaintiffs' requests on the

> grounds that it seeks the production of documents, data and information that contains proprietary, confidential, commercially sensitive, or personally identifiable information. Lennar objects to this Request to the extent that it seeks the production of documents or information that are subject to the attorney-client privilege, work product doctrine, joint defense or common interest privilege or any other privilege or protection.

(Deutsch Decl. Ex. 3.) In the meet and confer process, however, Lennar has been unable to specify precisely what requests seek privileged documents, or how the protective order on file in the litigation would not adequately protect Lennar's interests.

14

Finally, to the extent Lennar does have any valid privilege objection, it has failed to preserve it. If a subpoenaed party has a legal privilege which entitles it to refuse to produce materials, the proper course of action is to withhold those documents while producing a privilege log. The issuing party may then move to compel. *Stouder v. M&A Tech., Inc.*, 10-CV-02518, 2010 WL 4852280, at *1 (D. Colo. Nov. 19, 2010) ("A person withholding subpoenaed information under a claim that it is privileged or subject to protection must expressly make such claim and describe the nature of the withheld documents and/or information in a manner that does not reveal the information itself, but enables the parties to assess the claim.").

D. <u>Plaintiffs Have Taken Steps to Limit The Costs of Compliance.</u>

In communications with Plaintiffs, Lennar has argued that Plaintiffs have a duty to advance Lennar's costs of production. (Deutsch Decl. Ex. 3.) This, however, is incorrect. "A nonparty [subject to subpoena] is usually required to pay its own costs of production, so long as the costs do not represent an undue burden or expense. This rule is supported by basic principles of due process." *Stringer v. Ryan*, No. 08-21877-CIV-COOKE, 2009 WL 3644360, at *1 (S.D. Fla. Oct. 30, 2009) (quotation omitted, citing *Klay v. All Defendants*, 425 F.3d 977, 986 (11th Cir. 2005) (explaining that there is a "fundamental responsibility of every person to give testimony")). As noted above, Lennar has failed to establish undue burden, so it has no basis to insist that Plaintiffs cover its expenses.

## CONCLUSION

Plaintiffs seek relevant, non-burdensome discovery from Lennar. Plaintiffs' Motion to Compel should be granted.

Date: February 20, 2018                     /s/ *Mark A. Schweikert*
                                            Mark Schweikert (FBN 70555)
                                            Weil, Snyder, Schweikert & Ravindran P.A.
                                            201 S. Biscayne Blvd., Suite 850

15

Miami, FL 33131
T: 305-372-5352
F: 305-372-5355
MSchweikert@weilquaranta.net

*/s/Lawrence Deutsch*
Lawrence Deutsch (*Pro Hac Vice*)
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
T: 215-875-3062
F: 215-875-4604
ldeutsch@bm.net

*Counsel for Movants/Plaintiffs*